LEWIS *v.* MacCRONE.

1. BROKERS — MARGIN TRANSACTIONS — CLOSING OUT CUSTOMER'S STOCK.

Agreement by client, trading on margin with stock broker, that latter might sell without notice stock held for client's account upon failure of latter to maintain protective margin satisfactory to broker who had given him several notices to increase marginal deposit and to which client responded with payment, is construed as permitting client to rely upon reasonable opportunity to protect account being given by broker before closing out the stock.

2. SAME—RULE AS TO DEMAND FOR FURTHER MARGIN.

To justify broker in selling stock bought on margin for client, on depletion of margin, it is incumbent on broker to make demand on client for further margin, giving him a reasonable time to comply therewith.

3. APPEAL AND ERROR—DIRECTED VERDICT.

On appeal from judgment on verdict directed in favor of defendants, evidence is considered in light most favorable to plaintiff.

4. BROKERS—QUESTIONS FOR JURY—CUSTOMER'S MAN—NOTICE.

In action by client who had traded with broker under margin agreement after latter had closed out the account, question as to whether broker's so-called ''customer's man'' was such a representative of defendants as could bind them by what he did and said, whether telegraphic demand for additional margin sent to business instead of residence address after office hours was sufficient where he responded with reasonable alacrity after its receipt the next morning and as to whether defendants breached duty to inform client that order to sell his stock had been given at time additional margin was paid *held,* questions which should have been submitted to the jury.

Appeal from Wayne; Sweeny (Henry S.), J., presiding. Submitted April 9, 1935. (Docket No. 3, Calendar No. 38,129.) Decided June 19, 1935.

Assumpsit by Daniel Lewis against Edward E. MacCrone and Charles J. Collins, doing business as E. E. MacCrone & Company, for sale of stock purchased under marginal account. From directed verdict and judgment for defendants, plaintiff appeals. Reversed and new trial ordered.

*Rhodes & Rhodes,* for plaintiff.

*Butzel, Levin & Winston* (*C. M. Youngjohn* and *H. H. Silberman,* of counsel), for defendants.

Nelson Sharpe, J. The plaintiff opened a trading account with the defendants, a firm engaged in the stock brokerage business in the city of Detroit, in November, 1929. As he might desire to trade upon margin, he was required to execute an agreement, which provided in part as follows:

"4. That whenever it shall become necessary, in order to carry out any of my orders which may be accepted by you, to advance or expend any money, the amount of such advance or expenditure shall constitute a loan to me and upon demand I promise to pay to you the amount of any and all such loans, as well as broker's commissions upon orders, with interest thereon at such rate as may be from time to time agreed upon, and, in the absence of such agreement, at the rate of six per cent. per annum, and I authorize you to hold as collateral security for the payment thereof, or of any liability to you now existing or which may be contracted hereafter, all money, stocks or other securities deposited with you or purchased upon my account, with full power and authority to sell, assign and deliver the whole or any part thereof, upon any stock exchange, or at any public or private sale, at your option, upon the nonperformance of this promise, or the nonpayment upon demand of any of my present or future liabil-

ities to you, or upon my failure to maintain a margin to protect my account satisfactory to you, without advertisement or notice, such advertisement and notice being hereby expressly waived.   *   *   *

"7.   Any demand or other notice by you shall be a sufficient compliance with any requirement of demand or notice of this agreement, if deposited in the United States mail or delivered to a telegraph company addressed to me at the following address or such other address as I shall have designated to you in writing as my address for receiving notices, or to my business or residence address at the time."

His address was stated thereon to be 5919 Woodward, Detroit.

With each transaction plaintiff received a confirmation or invoice from the defendants, on the back of which was printed, in part, as follows:

"3.   That all or any of the securities in your account or supplied us against sales in such account, may be sold or purchased on a stock exchange, or at public or private sale, without notice, if such action is deemed necessary by us for our protection, and any deficiency arising out of such transaction is chargeable wholly to you and will be paid by you in full.   You will be considered to admit the correctness of each statement of account as rendered unless written notice of exception thereto has been given to us within four days after its receipt."

From profits made, the plaintiff, on December 13, 1929, had a credit balance with defendants of $2,333.50, and on that day defendants purchased for him 100 shares of Fox Film "A" stock at the market price of $44 per share.   His credit balance was applied thereon.   The stock steadily declined in value.   On December 19th it had dropped to about $25 per share, and defendants telegraphed plaintiff demanding immediate payment of $280 to meet their

margin requirements. On December 20th plaintiff paid defendants $280, and later on the same day, in answer to a telephone call therefor, an additional sum of $320. The stock continued to decline. On January 2d it opened at 22¾ and closed at 17¼. At 5:44 p. m. on that day, defendants sent a telegram to plaintiff at the address above stated, reading as follows:

"Your account is short $480 or 68 per cent. of margin requirements immediate payment at our office of this amount is requested stop loss orders have been entered for execution when account becomes approximately 75 per cent. short if you have already forwarded sufficient deposit please wire or phone us immediately—"

This telegram was similar to that sent on December 19th, except as to the amount requested and the percentage of margin requirements stated therein.

Plaintiff had left his place of business before the telegram arrived and did not receive it until about 9:45 the next morning. He went to defendants' office, arriving there at about 10:20, and gave his check for $480 to Frank L. Roberts, an employee of defendants, called a "customer's man," with whom he had had his previous dealings.

At the time of sending the telegram the evening before, defendants' margin clerk had entered upon his records that an order for the sale of the stock would be sent on the following morning, and at about the time of the opening of the New York stock exchange at 10 a. m. an order to sell the stock when it reached 16⅜ was transmitted by wire to their New York correspondent and telephoned by it to the floor of the exchange to be there executed. The defendants, on receipt of the $480 from plaintiff, at once wired their New York correspondent to cancel the

order for the sale. It reached New York at 10:33, and was at once telephoned to the exchange, but it arrived too late; the stock had been sold at 16¼. At the close of the exchange on that day, the price reached 22¾, and on February 6th it reached 39½.

On January 4, 1930, defendants sent plaintiff their check for $603.04 to repay the $480 paid them on the day before and a balance of $123.04 remaining in his account. A statement that it was to balance his account was later removed therefrom, and he then received payment on it.

In the following June, plaintiff brought this action to recover the loss he claimed to have sustained by the sale of the stock. It was tried before the court and a jury, and, at the conclusion of the proofs, the trial judge, on motion of defendants' attorney, directed a verdict for them. From the judgment entered thereon the plaintiff has taken this appeal.

The defendants contend that, under the provisions in the agreement executed by plaintiff when the account was opened and in the matter printed on the confirmation or invoice he received from them, on plaintiff's failure to maintain a sufficient margin to protect them they were authorized to sell his stock without notice to him. In paragraph 4 of the agreement, quoted above, plaintiff agreed that ''upon my failure to maintain a margin to protect my account satisfactory to you'' the defendants might sell his stock without notice. Under this provision, how was the plaintiff to know at any time that his margin was not satisfactory to the defendants? The defendants had construed it to require a demand for additional margin as evidenced by their telegram to the plaintiff on December 19th, their telephone call on the afternoon of December 20th, and their telegram on January 2d. While some of the other provisions in

the agreement and on the back of the invoice tend to support the contention of the defendants, in our opinion the plaintiff had a right to rely upon the defendants' giving him a reasonable opportunity to protect his account in a manner satisfactory to them.

In *Bache* v. *Johnson*, 255 Mich. 328 (76 A. L. R. 1514), this court quoted with approval from 9 C. J. p. 547, as follows:

"To justify a broker in closing out the transaction on depletion of the margins, it is incumbent on him first to make demand of the client for further margins, and the demand must be such as will give the client a reasonable notice or time to comply therewith."

At the top of the telegram sent plaintiff on January 2d appears the following: "Western Union 1930 Jan 2 PM 5 53 R X Z A 283 55—Detroit Mich. 2 544P." The hour marks thereon are unexplained. We think it may be assumed that the message was received by the telegraph company at 5:44 and dispatched by it at 5:53. There is no proof as to when it was delivered at plaintiff's place of business. However, in a letter written on February 11, 1930, by plaintiff's attorney to the New York Stock Exchange, asking for an investigation of the sale of plaintiff's stock, he stated that the plaintiff "did not receive the telegram until the evening due to his absence from his place of business."

All of plaintiff's dealings with the defendants had been with their employee, Frank L. Roberts. The plaintiff testified that when he delivered his check on December 20th he—

"Told Mr. Roberts that if they were going to send me telegrams after business hours to get in touch with me at my home at 1198 Virginia Park. He made a notation of it on his desk and he said, 'O. K.,

Mr. Lewis, I know that you want to protect your money that is here and we will see to it, we are going to do everything that is right, MacCrone & Company want to do the right thing. We will see you get your telegrams if it is necessary at your home.' ''

Plaintiff's home address appeared on defendants' records as well as his business address. Defendants' officials knew of the relationship which existed between Roberts and the plaintiff. When they needed additional margin on December 20th, it was Roberts who communicated with him by telephone therefor. As between Roberts and the defendants, the relationship was that of master and servant, but as between him and the plaintiff the jury might have found him to be the representative of the defendants and that they were bound by what he did and said.

As a verdict was directed, the evidence must be considered in the light most favorable to plaintiff's right to recover. Whether the demand for additional margin, sent by telegram to plaintiff's business address at the hour at which it was sent, was sufficient, and whether plaintiff, who received it at about 9:45 on the morning of January 3d, responded thereto with reasonable alacrity, were, we think, questions for the jury to pass upon.

Another question is presented. Plaintiff testified that when he took his check for $480 to defendants' office on the morning of January 3d, he gave it to Roberts, who then said to him—''Well, now, you are all O. K., everything is fine now, Mr. Lewis. You don't need to worry about anything now. The money is here and the stock can go down to ten and you are still protected. But in all probability the stock is going up;'' that Roberts obtained a receipt for him for the $480, signed by defendants' cashier, which

stated that it was a "payment to apply on account;" that he then left the office and did not know that his stock had been sold until the morning of January 6th, when he received the check by mail for $603.04; that he at once went to defendants' office, and was told by the manager that they were looking the matter up and for him "to hold the check and everything and when we get through investigating we will do the right thing with you, whichever way it is," and he left; that on defendants' removing the notation on the check that it was to balance his account he used it and was then told by defendants' manager that "when he completed his investigations, he would let me know how it came out—what the outcome would be—whether they would reinstate my stock or give me my money for the difference."

There is dispute as to what was said and done when the plaintiff took his check to the defendants' office on the morning of January 3d. Clearly, a duty devolved upon the defendants to inform plaintiff that the order for the sale of his stock had been sent to the New York Stock Exchange and that it might be sold before a countermanding order would reach their correspondent. He could then have waited until information relative thereto was received by defendants, and have protected his investment by a repurchase of his stock if he desired to do so. If the jury found the facts to be as testified to by the plaintiff, there was such a breach of duty on the part of the defendants as renders them liable to him in this action, and this question should have been submitted to them.

In "The Law of Stock Brokers and Stock Exchanges," written by Charles H. Meyer of the New York bar, the questions here presented are discussed at length. Reference may also be had to "A Hand-

book of Stock Exchange Laws," written by Samuel P. Goldman, also of the New York bar.

The judgment is reversed and set aside, with costs to plaintiff, and a new trial ordered.

POTTER, C. J., and NORTH, FEAD, WIEST, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred. BUTZEL, J., did not sit.